## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **GIANCARLO CARBONE and JEREMY** | : | **CIVIL ACTION NO.** |
| **HUARD on Their Own Behalf and on Behalf of** | : | |
| **All Others Similarly Situated, Plaintiffs** | : | **CLASS ACTION** |
| | : | |
| **VS.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **FANDUEL, INC. and DRAFTKINGS, INC.** | : | **NOVEMBER 25, 2015** |

## CLASS ACTION COMPLAINT

Plaintiffs, GIANCARLO CARBONE and JEREMY HUARD ("Plaintiffs"), each

individually, and on behalf of all others similarly situated, by and through counsel, brings this

action against FanDuel, Inc. ("FanDuel") and DraftKings, Inc. ("DraftKings"), (collectively

"Defendants"), and states as follows:

### I.      NATURE OF THE CASE

1.      This is a class action complaint against FanDuel and DraftKings, two companies

operating daily fantasy sports ("DFS") websites in a manner that violates the laws of several

states, including Connecticut.

2.      DFS is a non-regulated industry where individuals compete against other

individuals in fantasy sports games on a daily basis. That is, Defendants operate tournaments

where individuals accumulate points based on the real-life statistics of players in professional

sporting events that occur on a particular day. Individuals can play for free or pay money to

compete for cash prizes.

3.      The start of the 2015 National Football League ("NFL") season saw a huge media

marketing presence as Defendants spent more than $100,000,000 on television ads and became

two of the top television advertisers in the United States. As a result of this advertising, Defendants added millions of new users.[1]

4.      Defendants make money on the fee they take from each entry into their contests. While the prize pools of these contests are funded from entry fees, Defendants often guarantee prize pools, and will pay out the difference between the guarantee and the entry fees.

5.      The difference between the entry fees in the prize pool and the guarantee is called the "overlay" and gives Defendants additional incentive to attract as many users and entries as possible into contests to avoid having to pay out this overlay, or to have their own employees win prize pool money through inside information.

6.      DraftKings refers to its new users as "fish" and relies on new users who lack skill to keep its most active users – and therefore profitable entry fee generators – on their site.[2] According to one analysis, the top 1.3% of players paid 40% of the entry fees, and the most active 6.3% of players paid 76% of entry fees.[3]

7.      The CEO of FanDuel also recognized the need to attract as many new, inexperienced players as possible to keep its most profitable players happy.[4]

---

[1] http://blogs.wsj.com/cmo/2015/09/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/   (accessed Oct. 7, 2015).
[2] Id.; S*ee also* https://rotogrinders.com/threads/dk-frequent-player-points-130623; https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5;   (accessed Oct. 7, 2015) (posts by user JRobs, the online screen name for DraftKings CEO Jason Robins).
[3] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 7, 2015).
[4] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=10 (accessed Oct. 8, 2015).

8. These material misrepresentations and omissions fraudulently induced Plaintiffs and the proposed classes to give Defendants money, which ultimately went to Defendants and their employees through fees and contest prize.

9. Specifically, Plaintiffs deposited and risked at least $235.00 on DraftKings tournaments and contests, and at least $140.00 on FanDuel tournaments and contents, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.

## II.    PARTIES, JURISDICTION AND VENUE

10. Plaintiff, Giancarlo Carbone, is a resident of Hartford County, Connecticut, and citizen of Connecticut. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.

11. Plaintiff, Jeremy Huard, is a resident of Litchfield County, Connecticut, and citizen of Connecticut. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.

12. Defendant DraftKings, Inc., is incorporated in Delaware with its principal place of business in Boston, Massachusetts.

13. Defendant FanDuel, Inc., is a Delaware corporation with its principal place of business in New York, New York.

14. This Court has subject matter jurisdiction over both the parties and the subject matter because a substantial number of the events giving rise to this complaint occurred in Connecticut, including substantial concerted activities of both FanDuel and DraftKings, as well as numerous prospective class members. Jurisdiction also lies under the Class Action Fairness Act, pursuant to 18 USC §1332(d) as it is a class action involving plaintiffs from different states

as the defendants and the amount in controversy exceeds the sum of $5,000,000.00 exclusive of costs and interest.

### III. FACTUAL BACKGROUND

#### A. Daily Fantasy Sports

15.     Defendants are able to operate their websites because they market DFS as a game of skill, like chess or the stock market.  It is also similar to pari-mutuel horse race wagering in that players compete against each other for prize pools and Defendants take their fee from the prize pool itself.

16.     Defendants held themselves out to Plaintiffs and the classes as places where their skill made a difference between winning and losing.  For instance, in a television commercial (available at https://www.youtube.com/watch?v=VDa-cDu8KYg) that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills….you like football, you like winning." In another commercial in August 2015 (available at https://www.youtube.com/watch?v=bfCm6PJuL5I), DraftKings advertised its website as "a game within the game, that requires a different set of skills…we don't just play, we are players, we train, and we win."

17.     Similarly, FanDuel advertised (available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge) that players could "get paid for [their] knowledge" if they were "smarter than the average fan."

18.     In reality, most of the money on DFS sites goes to a few individuals at the top. An analysis of publicly available data by Sports Business Daily found that in the first half of the

2015 Major League Baseball season, 91% of profits were won by just 1.3% of players.[5] An

analysis done by Bloomberg showed a similar distribution heavily weighted towards the top 1%

of players.[6]

### B.    Value of Inside Information and Data

19.    DFS customers play against each other by choosing a line-up of players at certain

positions until they have reached a "salary cap" for their team, and then entering tournaments

with entry fees as low as 25 cents and as high as $5,300. The players whose fantasy teams score

the most points – based on the real statistics of those players in that game – win the most money.

20.    DFS is not gambling because of the skill involved in picking a winning team.

According to Robins, DraftKings attracts players "who are analytical and favor data and

research." Robins said: "They do their homework. It's like the stock market. They enjoy looking

at something and trying to figure out something that someone else doesn't see."[7]

21.    The biggest edges any player can have come from having data and information.

DraftKings and FanDuel employees have access to both things, neither of which is public.  For

instance, DraftKings performs analytics to determine winning strategies, return on investment of

certain strategies and even how lineups on FanDuel would do if they were entered into

DraftKings contests.  DraftKings knows the value of this data and knows that it should not be

shared: "The reason that I don't want to give the actual numbers is because I believe it creates a

---

[5] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 7, 2015).

[6] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (accessed Oct. 7, 2015).

[7] Howard Stutz, DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing, Las Vegas Review-Journal, (Sept. 29, 2015), available at http://www.reviewjournal.com/business/casinos-gaming/draftkings-ceo-compares-fantasy-sports-chess-stock-investing (last visited Oct. 7, 2015).

slippery slope where people start requesting stats on win rates of various strategies, which I believe is not a positive thing…That said, I really don't think site owners should be sharing stats on winning vs. non-winning strategies.  Part of what makes this a skill game is that people who are skilled at it can figure out for themselves how to win consistently.  And on that note, I do also want to point out that skilled stacking is absolutely a winning a strategy on DK.  There are plenty of people who stack and win very consistently."[8]  He went on to point out: "A lot of mixed teams that are winning on other sites would fade the stacks on DK and win if they were just entered.  But they are not being entered. Take a look at some other site winning lineups and add it up for DK, you'll see it happening."[9]

22.     In addition to years of data on optimal strategies, which gives Defendants' employees a huge advantage over even the most "skilled" DFS players, Defendants' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

23.     Defendants also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

24.     Because the goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many ways, including the ability to make rosters with enough players different from competitors' rosters.

---

[8] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (accessed Oct. 7, 2015).
[9] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=7  (accessed  Oct. 7, 2015).

25.      Indeed, a DraftKings employee accidentally posted ownership percentages online before they were supposed to be publicly available – that is, before all of the contestants' lineups were "locked" and could therefore still be changed.  This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."[10]

26.      However, the same week that he posted roster data before he was supposed to, this same employee played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000.11[11]   An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to inside DraftKings working for a DFS company.

27.      DraftKings and FanDuel, in concert, said that this employee beating 229,883 people the same week it was clear he had access to ownership data was a "coincidence."[12]

28.      In all, DraftKings employees have won at least $6,000,000 playing at FanDuel in, which is more than one million dollars per year considering DraftKings is only a few years old.[13] The ability of FanDuel to calculate that information within days of public knowledge shows that FanDuel can track which players are from other DFS sites and can track how much they are winning, losing or otherwise what the possibility is that other DFS employees are using non-public information, data and insider strategic information.

---

[10] https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (accessed Oct.  7, 2015).

[11] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 7, 2015).

[12] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015)

[13] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (accessed Oct. 7, 2015).

29.     DraftKings was well aware of its employees playing at FanDuel, and aware that some of its employees made more money from winnings on FanDuel than their actual salaries.[14]

30.     FanDuel profiled one of its own employees who played on other sites and had won $50,000 in a short period of time, but has since removed the article from its website.[15]

31.     Robins admitted that he "had reservations" about allowing employees to play on other sites and allowing other sites' employees to play on his site, and even spoke to his competitors about ending the practice, but ultimately decided, in concert with his competitors, to continue the practice. Robins said: "And I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."[16]

32.     In that same article, Robins admitted that numerous employees have access to data that could give players an advantage, including customer service and engineering workers.

33.     Robins had previously discussed[17] any sort of issue that affected "game integrity" as fraud, and literally the first person to respond is the employee who won $350,000:

---

[14] https://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR9C55R8hwL/story.html (Oct. 7, 2015).

[15] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (accessed Oct. 7, 2015).

[16] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015).

[17] https://rotogrinders.com/threads/ok-industry-wide-concern-this-is-not-directed-at-any-single-85017?page=1 (accessed Oct. 7, 2015).



**JRobs**                                                    2 years ago

DraftKings CEO

This is a very interesting topic. One of the things DraftKings has been talking about from day 1 is fraud prevention, and while I cannot speak for other sites, I would imagine that many of the basic steps we have taken have been adopted by most. There is a whole category of payment fraud and identity fraud that we focus on, but I will focus here on the game integrity question since that is the one that was raised.

First off, we built our customer support tools interface so that the same rules that apply to players on the site also apply to what our customer service representatives can do. In this case, that means that when games start and rosters lock, changes are no longer possible for either party. We have had people contact us claiming their screen "locked early" before they could make a swap and asking us to do it for them. Unfortunately, even if we wanted to, our customer support team literally can't do this.

However, it is possible that someone on our tech team could manually go into the database and change something by writing code. Aside from simply being VERY selective about who we give database access, we recognize that there is a need to protect against fraud here. Not only could a rogue employee be disruptive, but someone could attempt to hack the database, as well. I cannot go into detail about what exactly we do here, but we have put a lot of safeguards in place to prevent this. Additionally, we have very strong monitoring tools and reports that flag suspicious activity or things that simply should never be happening on the site, such as a lineup change made later than a contest start time. There are many other things we look for, as well, and we have actually caught a few players that were attempting fraud. A good sign to me is that every one of them has been caught immediately following their first fraud attempt and each one has been banned from the site by pretty much any identifiable characteristic – name, username, address, and even IP address.

Of course, fraud is an issue that (as Cal mentioned with poker) is naturally going to be a lightning rod for the DFS industry as it grows. I would love to see the sites start to band together on these things to help put current players at ease and make new players more comfortable giving DFS a try. I know within certain industries, fraud techniques are widely shared amongst competition, and I think it serves all of us well to minimize fraud on anyone's sites, not just our own. One no-brainer to me is some sort of public exchange between sites and affiliates of "known fraudster" lists. There is no reason why someone banned from one site should easily be able to go play on another. This is something we have talked about a lot internally, so I'd be interested to hear if other site reps out there think there might be broader interest within the industry in getting something like this going?

                                                    Reply Quote Link

34.    In that post, Robins uses the word "fraud" or "fraudster" nine times.  Robins also discussed how sophisticated its data analysis and fraud prevention efforts were, including tracking users by their Internet Protocol, or IP, addresses.  Thus, DraftKings could easily monitor users who worked for FanDuel or other sites to determine their winnings and whether there existed the possibility they were using inside information.

35.     For instance, an analysis by DFS Report shows that an employee at FanDuel who works in product operations is one of the top 50 players in all of DFS, despite only playing on one site.[18]  While there is no evidence this employee had access to ownership data, this individual won more than $50,000 in the early part of the baseball season on other sites.  One of his jobs includes setting player prices, which gives him detailed daily information about pricing models and could help him identify inefficiencies or opportunities on other sites.  While the article has been removed from FanDuel's website, a version is still on the Internet.  In that article, the FanDuel employee profiling the FanDuel employee noted: "The fact Boccio does not play on FanDuel against you folks is a good thing.  He clearly has a winning strategy…or 10."[19]

36.     According to Legal Sports Report, an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees – often executives – of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"[20]  FanDuel's CEO admitted to personally playing on competitor sites.[21]

37.     Had Plaintiffs and/or members of the proposed classes known that Defendants were working in concert to allow employees of DFS sites to play against them, Plaintiffs and members of the proposed classes would not have played on Defendants' websites.

---

[18] https://dfsreport.com/6898/follow-up-to-draftkings-fanduel-mishaps/ (accessed Oct. 7, 2015).
[19] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (Oct. 7, 2015).
[20] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (Oct. 7, 2015).
[21] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (Oct. 7, 2015).

38.     Had Plaintiffs and/or members of the proposed classes known that Defendants had acted in concert to sanction this practice, Plaintiffs and members of the proposed classes would not have played on Defendants' websites.

39.     Overall, Plaintiffs deposited at least $235on DraftKings and $140 on FanDuel before the disclosure of the fact that DFS employees were playing with inside information.

40.     After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statements on their websites, continuing to act in concert.

41.     DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

42.     Ultimately, Defendants together changed their internal rules to both prevent their employees from playing on other DFS sites and to prevent DFS employees from playing on their sites.

### C.     Invalidity of Arbitration Provision of Terms of Use

43.     DraftKings's Terms of Use is not a valid, enforceable contract.

44.     Plaintiffs and the class were fraudulently induced into placing money onto DraftKings because it was supposed to be a fair game of skill without the potential for insiders to use non-public information to compete against them.

45.     The so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by DraftKings are illusory.  Indeed, there is no restriction on DraftKings' ability to terminate the "agreement" or to refuse to perform.  For example, the so-called "Terms of Use" provide that DraftKings and related individuals such as officers and directors are

released from any liability for any claim by the user "whatsoever": By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to … [examples of various types of liability listed].

46. Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to Defendant the right to deny service to any user for any reason "whatsoever": "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever." Thus, DraftKings is not bound to any performance obligation.

47. Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your rights granted hereunder." Thus, once again, DraftKings is not bound to any performance obligation.

48. The Terms of Use purport to require arbitration, but gives DraftKings the exclusive right to revoke the arbitration provision because it states that "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts."

49. In addition, a user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through separate transactions.

50.     The Terms of Use are procedurally and substantively unconscionable.

51.     As a direct and proximate result of the actions described above, Plaintiffs and members of the proposed classes have been damaged.

## IV.   JURISDICTION

52.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Classes consist of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## V.    VENUE

53.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Plaintiffs both resides in this District and utilized the DFS services of the Defendants in this District. Moreover, both FanDuel and DraftKings have marketed, advertised, and engaged in transactions with consumers in this District.

## VI.   CLASS ALLEGATIONS

54.     Carbone and Huard bring this action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3) on behalf of himself and a nationwide Plaintiff class (the "Nationwide Class") consisting of all persons or entities in the United States who engaged in transactions with the Defendant Companies.

55.     Excluded from the Classes are Defendants, their parents, subsidiaries and affiliates; all officers, directors, employees and agents of the Defendants; governmental entities; and any agent or employee of any federal or state government acting in their official capacity.

Carbone and Huard reserves the right to revise the definition of the Classes based upon subsequently discovered information.

56.     Carbone and Huard does not know the exact number of Class members because such information is in the exclusive control of Defendants.  Upon information and belief, Carbone and Huard believe that there millions of Class members, geographically dispersed throughout Connecticut and the United States, such that joinder of all Class members is impracticable.

57.     There are questions of law and fact common to the Classes that predominate over individual issues, including but not limited to the following:

     a.  Whether Defendants made the representations set forth above and substantially similar representations to Plaintiffs and members of the proposed classes;

     b.  Whether Defendants' advertisements were false, misleading or unfair;

     c.  Whether Defendants owed duties to Plaintiffs and the proposed classes, the scope of those duties and if they breached those duties;

     d.  Whether Defendants fraudulently induced Plaintiffs and the proposed classes into using their website under false pretenses, through material misrepresentations or material omissions;

     e.  Whether consumers were harmed by Defendants' actions as described above;

     f.  Whether the Terms of Use are unconscionable, illusory, fraudulent or otherwise invalid;

     g.  Whether Carbone, Huard and other members of the Nationwide Class are entitled to damages and other monetary relief, and if so, in what amount;

     h.  Whether Defendants' employees used non-public data and/or information to gain an advantage at DFS sites, whether Defendants acted in concert to condone, allow or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to disclose to Plaintiffs and the proposed classes that these practices were occurring.

58.     Carbone's and Huard's claims are typical of the claims of the Classes.  As alleged herein, he and other members of the Nationwide Class all sustained damages arising out of the Defendants' same course of unlawful conduct.

59.     Carbone and Huard are adequate representatives who have selected competent counsel fully qualified to represent the Classes.  Carbone and Huard intend to vigorously prosecute this action.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  In contrast, the interest of members of the Nationwide Class in individually controlling the prosecution of separate actions is not practical.

61.     Further, individual litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the courts.  Moreover, even if the individual Class members could afford to conduct individual litigation, the burden on the court system would be too great.  The class device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

62.     Certification is also warranted under Fed. R. Civ. P. 23(b)(2) because FanDuel and DraftKings have acted or refused to act on grounds generally applicable to the Nationwide Class, thereby making final injunctive relief and declaratory relief appropriate with respect to the Class as a whole.

**VII.    <u>CLAIMS FOR RELIEF</u>**

**COUNT I**
**NEGLIGENCE**

65.     Plaintiffs repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

66. DraftKings and FanDuel owed duties to Plaintiffs and the proposed class as users and paying customers of their sites to use reasonable care to provide true, reliable and safe information and contests.

67. Defendants breached their duties to Plaintiffs and the proposed class by failing to prevent persons with inside information and data by virtue of their employment at other DFS sites from competing against Plaintiffs and the proposed class.

68. In the course of their business, profession and employment, Defendants and their agents, representatives and employees supplied false information to Plaintiffs, the proposed class.

69. Plaintiffs and the proposed class justifiably relied upon the information supplied by Defendants, and, as a result, engaged in business with Defendants and lost money.

70. Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data and ability of employees to use material, non-public data to compete against Plaintiffs and the proposed class on other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiffs and the proposed class competed.

71. As a direct and proximate result of Defendants' negligence, Carbone, Huard and the Nationwide Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT II
## FRAUD AND MISREPRESENTATION

72. Plaintiffs repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

73.     Defendants made material representations that were false, that defendants knew were false or were reckless as to the veracity and made with the inducement for Plaintiffs and the class to act upon.

74.     Specifically, and as detailed above, Defendants represented that their contests were fair games of skill.  Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public information, data and access to Plaintiffs and the proposed class's submissions would use this information to compete against Plaintiffs and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiffs and the class's ability to use skill to win.

75.     Plaintiffs and the proposed class acted in reliance on the false, material representations and omissions made by Defendants, which caused them injury.

76.     Plaintiffs and the proposed class would not have deposited money or engaged in any activity on Defendants' websites if they had known that they were competing against individuals with insider knowledge, access and use of non-public data.

77.     Defendants were aware that the integrity of the games was a material fact in inducing Plaintiffs and the proposed class to give them money in exchange for services and agreeing to the alleged contract.

78.     As a result of Defendants' fraudulent representations and fraudulent omissions, Plaintiffs and the proposed class were induced into a contract that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

**COUNT III**
**UNJUST ENRICHMENT**

79.     Plaintiffs repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

80.     Plaintiffs and the members of the proposed class conferred a benefit on Defendants by depositing money and playing in contests on their websites.

81.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs and the members of the proposed class deposits and contest entries, which retention under these circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the fair play available on their websites.

82.     Plaintiffs and members of the proposed classes were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts.  Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiffs and the members of the proposed classes is unjust and inequitable,

83.     As a direct and proximate result of Defendants' unjust enrichment, Carbone, Huard and the Nationwide Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damage and restitution, incidental and consequential damages, and other damages allowed by law.

## COUNT IV
## BREACH OF CONTRACT

84.     Plaintiffs repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

85.     As detailed above, Defendants represented that their contests were fair games of skill.  Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public information, data and access to Plaintiffs and the proposed class's submissions would use this information to compete against Plaintiffs and obtain an enormous increased

chance to win, thereby greatly decreasing Plaintiffs and the class's ability to use skill to win.

86. Absent these misrepresentations and omissions, and if they had known that they were competing against individuals with insider knowledge, access and use of non-public data. Carbone, Huard and the other Nationwide Class members would not have engaged in DFS tournaments, contests or competitions. Accordingly, Carbone, Huard and the other Nationwide Class members were deceived as to the nature of DFS contests and did not receive the benefit of their bargain.

87. In failing to provide the fair games of skill as advertised, the Defendants breached their agreement with the Plaintiffs and Nationwide Class members.

88. As a direct and proximate result of Defendants' breach of contract or warranty, Carbone, Huard and the Nationwide Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V
## VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
## CONN. GEN. STAT. § 42-110A, ET. SEQ.

65. Plaintiffs repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

66. At all relevant times hereto, the Defendants were prohibited by Section 42-110(b) of the Connecticut General Statutes from engaging in unfair deceptive acts or practices in the conduct of their business in the State of Connecticut.

67. The actions of the Defendants constitute a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stats. Section 42-110a, *et seq.*,in that such actions were immoral, unethical, oppressive, unscrupulous, offend public policy, and caused substantial injury

to consumers, including the Plaintiffs and Connecticut Class members, and were done with reckless indifference to the rights of the Plaintiffs and Connecticut Class members. These actions include that:

    a. As detailed above, the Defendants advertised and marketed for a DFS service which alleged to involve fair games of skill, which was knowingly false;

    b. As detailed above, the Defendants allowed their employees to access non-public information and data to be used to defraud the honest and fair play of other DFS services websites;

    c. The Defendants intention and purposeful policies and acts, as described above, were intended and did cause the Plaintiffs and class members to engage in DFS contests that were inherently unfair in providing an unfair advantage to DFS employed players.

68. The actions of the Defendants as described in this complaint caused the Plaintiffs and class members to suffer actual and ascertainable injuries, damages, loss of money and property.

69. Pursuant to Section 42-110g(c) of the Connecticut General Statutes, a copy of this complaint has been mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut.

## VIII.   REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of members of the Nationwide Class, respectfully request that the Court enter judgment in their favor and against Volkswagen, as follows:

    a. Certification of the proposed Nationwide Class;

    b. An order temporarily and permanently enjoining Defendats from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

    c. Compensatory damages, restitution, punitive damages, including costs;

d.  An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

e.  Attorneys' fees; and

f.  Such other or further relief as may be appropriate.


PLAINTIFFS, GIANCARLO CARBONE AND JEREMY HUARD


By_____/s/_____
        Bruce E. Newman (ct12301)
        Cody N. Guarnieri (ct29237)
        Brown Paindiris & Scott, LLP
        747 Stafford Avenue
        Bristol, CT 06010
        Tel.:  860-583-5200
        Fax:  860-589-5780
        bnewman@bpslawyers.com
        cguarnieri@bpslawyers.com

        -and-

        Zak Jazlowiecki
        Jazlowiecki & Jazlowiecki
        11 Lincoln Avenue
        P.O. Box 9333
        Forestville, CT 06010-9333
        Tel. (860) 589-8000
        Fax: (860) 585-1561